Chief Judge Smith, if it please the court, Judge Strauss, Judge Molloy, my name is Al, well led. I'm with Elric & Perney in Cedar Rapids. I'm here on behalf of the appellant Richard Mathis. I want to start by making this court's job just a little bit easier. In regards to the appellant's first brief point, where we argue that the criminal history category was miscalculated, upon further reading of the appellee's brief, upon many rereadings of the United States sentencing guidelines, it's not miscalculated. It is a criminal history category 4, not a criminal history category 3. We're withdrawing that argument. Now that we still take exception to the four-level enhancement, we still take exception to the motion for upward variance. But if you were to recalculate that with a criminal history category 4 as opposed to 3, and if you decided to get rid of the four-level enhancement, I believe that we're looking at a advisory guideline range of roughly 37 to 46 months without any motion for upward variance. And that's the relief that we're asking for, is a remand for resentencing consistent with that guideline range. Your Honor, if it pleased the court, what I'd like to do with the majority of my time is devote my oral argument to our second brief point, that the four-level enhancement was an abuse of discretion and should not have been imposed. And of course, this is the information that goes to the minor child, KG in this case, where originally in Muscatine County District Court in the state of Iowa, my client was charged with harboring a runaway. And that because of his possession of a weapon, he should receive a four-level enhancement. KG, in and of himself, Your Honor, is an interesting young man. At the sentencing, at the, excuse me, at the resentencing hearing that we had on behalf of Mr. Mathis, it was shown that there were many inconsistencies in his stories, that after further investigation, law enforcement dismissed the harboring of a runaway charge, and that eventually KG himself was charged with false reports. So we start off with this baseline, if you will, of a complaining individual who, at least from the appellant's point of view, is, lacks complete credibility. And then in looking at some of the record that was established at the resentencing... The District Court make fact findings on this point? Yes, Your Honor. The District Court did, Your Honor. And did find that, according to Judge, from Judge Jarvis' perspective, that by a preponderance of the evidence, the enhancement applied. He believed that there was, that the harboring of a runaway had been proved. He also believed that the weapon facilitated or had the potential to... So you're arguing now that the court's findings were clearly erroneous? Yes, Your Honor. We are. We are. And this panel can look at it in one of two ways. You can look at it that the harboring charge was not proven, or if you agree with Judge Jarvis that, well, we do believe there was a harboring charge here that he could rely upon. It really gets to what may very well be the meat of this issue. Did this weapon, did this .22 caliber rifle, facilitate this charge in some way or have the potential to do so? Well, let's take the harboring point. I mean, you do have, just, you know, to get to get at it, you've got the dog sitting and you get the testimony about the dog sitting out outside the room and you have, I mean, I guess my point is how do we, how do we conclude that the harboring of a runaway here was clearly erroneous? I think what you can look at, Your Honor, is this, is you can look at the fact that once my client learned that KG was a minor, he returned the minor. There's also the interesting testimony that the minor left Mr. Mathis's house on one evening and went to a girlfriend's house, completely voluntarily, and then returned. Now, you would think if if a person was being harbored, once they had the opportunity to go to a girlfriend's house or anyone else's house, they wouldn't be coming back. And so I think that contradicts this finding by the district court that sure we had a harboring of a runaway. But it doesn't require, it doesn't require him to have kidnapped the child. It requires him to have, for the child to have been a runaway and for him to have kept that runaway within his home. And so, I don't know, it just seems to me that that that part of it has been, or at least there's a sufficient evidence that that had happened. And my only response to that, Judge Strauss, would be to look at the inconsistencies in this, in this young man's testimony and the fact that eventually Marion Police found him to be so inconsistent, they filed a false reports charge against this same minor child. So you want us to re-evaluate the credibility of the witnesses? Well, and that would be a longer road for me to get down, Your Honor. I appreciate where the court's coming from, that re-evaluating his credibility might make my position even harder. But I think what you're left with, when you look at the totality of the facts that were brought out during the resentencing hearing, is that this, this young man's testimony just lacks a basic bottom line of credibility. And it, and it's enhanced by the fact that he was charged with filing false reports. But, that was my earlier point, if you disagree with me, and Judge Strauss, you may say, okay, Mr. Ouellette, there's harboring. So now where do we go? Now it gets back to the interesting issue, I know Judge Molloy was the author in the Smith case, about does this weapon facilitate the crime or have the potential to facilitate the crime? And there, we believe the facts are absolutely lacking. KG falsely alleged that Mathis held him at gunpoint. KG was only aware of the firearms presence, but never aware of Mathis handling firearm in any way. So what we seem to have, is we seem to have a weapon present in the home with no purpose or no potential to facilitate this crime. And I, and I, it's that second prong, your honor, if you will, where I, I think the four-level enhancement falls apart. Does it matter that the young, young man knew the gun was there? Knowing, knowing the gun is there and reacting to it, your honor, I think are two different, two different steps. And I, and I'm not trying to slice the onion too thinly with you, but he, obviously he's aware of the firearms presence, but how is, how is the firearm utilized? How does he react to the presence of the firearm? If the, if the lower court or the district court believes that KG was telling the truth when he says he was intimidated by the gun, how are we to, what position are we in to? The interesting thing about the intimidation, your honor, is that, and excuse me for just a second, I'm trying to look for one fact, because that was discussed with law enforcement. The intimidation part started when Mr. Mathis realized KG was a juvenile, but law enforcement could not offer any ideas to the timeline of when this was. So this concept of, okay, he's intimidated, okay, he's intimidated, but when? And in relation to what, your honor? Even, even if we accept, well, it was in relation to the weapon, but, but when? The, the facts don't rise up to the level of a preponderance, to prove this by a preponderance of the evidence. There's just insufficient facts. There's too many, your honor, if you would, there's too many unknowns. Well, I would be with you, to be quite honest, if all we had here was the gun leaning up against the wall, I guess it was in the kitchen or in another room, it wasn't exactly, I couldn't tell from the record exactly where it was, but it was not used. Right. Leaning up against the wall, and I think I would be with you, because I don't think nearly having a gun in the home in open view necessarily gets you there. But, we have circumstantial evidence, to get to Judge, Chief Judge Smith's point, we have circumstantial evidence that he was trying to intimidate the runaway and staying inside the home, and that's why I mentioned the dogs earlier. If you combine the dogs and you look at the gun, well, the gun was just another thing, just like the dogs, to keep the runaway intimidated and in the home. And, your honor, my response to that would be, it appears that all of the intimidating factors were devoid of the use of the gun. The gun's present, but the gun is never utilized and doesn't have the potential to facilitate the intimidation, if you will. But, if I'm a young kid, or 15, I don't know, 15 or 17, I forget what his age was, and I'm, you know, I can't, it's hard to put yourself in that position, and there's dogs outside my room, and I see a gun every time I leave the room, that total picture would certainly be very intimidating. If he were a normal 15 or 17 year old, we would argue that he's not, because he's deceitful, and that's what's shown throughout this. He's completely deceitful. If the court would allow, I think I have 15 seconds left for rebuttal, so I better stop talking. Thank you. Thank you, counsel. Mr. Westfall. Good morning. May it please the court. Richard Mathis preys on young males, and Chief Judge Jarvie did not err by finding both that Mr. Mathis harbored a 15-year-old KG, or that the .22 caliber rifle found at the front of the residence had the potential to facilitate that harboring of a runaway. And just to, like, move to the second factor first, as I was focused to the questions of counsel's argument, we believe that there was a preponderance of evidence to show that connection, and Chief Judge Jarvie did not err by finding that it did, in fact, have the ability to facilitate or potential to facilitate. It was found, I believe, by the record at the front of the entrance, and the KG, when he talks about, like in the second interview, when Detective Miller questions him about some of the things that were false from his first statement, that he did not directly point the firearm at him, or he was not being held at gunpoint in some emails. KG admits up front what he was untruthful about, but also still notes the presence of the firearm in the residence, found at the front door, where he describes where it's at, and that that presence of that firearm, in conjunction with the other facts that he notes, intimidated him to not leave the residence. Wanda Gott talks about that when the police officers come out, actually the Muscatine County Sheriff's Office comes out on February 25th of 2013, she knows already at that point in time that KG is a missing person and 15 years old, and that night, in order to the residence, she has the dog lay out there to keep him from leaving the residence. In addition, KG notes not only to the control that Mr. Mathis and Wanda Gott exercised over him while he was there, he also notes that Mr. Mathis freely shared stories as being in prison, of his being proficient at beating people up, and in fact, according to KG, bragged about that, and that also led him to believe that he would face physical harm, and interjecting into that atmosphere, the presence, the prominent presence of this firearm at the front of the residence, supported it. What do we make of the fact that he did leave the residence and spent the night with his girlfriend and then voluntarily came back? If he was so intimidated that he couldn't leave, how did he get, how did he go spend the night with the girlfriend and then voluntarily return? Well, I think that fact viewed in the context of the other things, let's take that fact alone. He was allowed to leave one night, and as described by KG, although he went to his girlfriend's house, and his cell phone ends up going dead during that time, he finds a host of messages from Mr. Mathis, wanting him to immediately return, and I believe in the first sentencing, Detective Reese confirmed with the girlfriend he was there basically one day, and that Mr. Mathis says he's on the way back there the next morning. So it's like, it could be interpreted as a bit of a reward for Mr., or for KG to be there, a bit of a reward for Mr. Mathis, but he also shows his discomfort from him being there too long, and Mr. Mathis, I think by that evidence, shows that he wants to get him back as soon as possible. So it's a lesser degree of control, but I think still consistent with the fact that they were trying to control his movements, and even when they granted him that one day of freedom, they wanted him back as soon as possible, and they were concerned when they couldn't have, Mr. Mathis was concerned when he couldn't have contact with him, and he went back there. There's also this other evidence about taking the trip to Illinois, where Mr. Mathis is driving with KG to Illinois and crosses a bridge and tells him to duck down, because he's afraid of being found with KG. So I think overall, all these facts are consistent with KG's statement. He's a 15-year-old runaway, who was, went to Mr. Mathis' residence at the promise of pools and spas and outdoor theaters, and he was controlled, sexually molested, and felt threatened by Mr. Mathis to not leave there. On February 25th, both KG and Juan D'Agostino, law enforcement is there, they already know he's missing, and then he's 15 years old. Mr. Mathis returns him a day or so later, not because that's the first time he finds out, because he knows what's coming. He knows the police will be out there soon to again look for him, and again, as he has in the past, he's going to be in trouble for hiding out juveniles. Again, he knows because we had this testimony about in 1990. He has these two 13 and 14-year-old young males hidden underneath his trailer while he's at the police department saying, I don't know where they're at, I returned. So again, his pattern of conduct is certainly also consistent with the court's finding. Counsel, I want to ask you a question about 2K2.1. So it uses the word in-connection, uses the firearm in connection with another felony offense. Here are the firearms, the rifle sitting against the wall, and then I looked at harboring a runaway, the Iowa statute, and in addition to the harboring part of it, it also requires the commission of another felony offense, and here the other felony offense is sexual acts, the sexual acts that he committed with the child. Now, when the allegation or when the testimony was he pointed the gun at the child's head or pointed the gun to the child, you might have had that, but there's no connection now between, there is a connection between intimidating the victim, but there's no connection now between the gun and the sexual acts that were the other felony offense under harboring a child. Is that a problem? It's not the precise argument they're making, but I'm a little worried that there's a few different elements to harboring a child, and it may have contributed to harboring, but it might not have contributed to the underlying sexual acts. Well, I don't know, do you apply the Hansman if we need both? But I also think that the record establishes that Mr. Mathis' goal in luring these young males to his trailer is for sexual purposes, and while he admits later that Mr. Mathis wasn't pointing the gun at him, it doesn't eliminate the fact that Mr. Mathis is intimidating him to remain there, and one of the primary motives, I think, is that he wants to sexually molest him and sexually assault him. So I think there is sufficient evidence, certainly a preponderance of the evidence, to find that it would fit both, both aspects of it. I also believe, unless there's other questions about that prong, that Chief Judge Gerevy was correct in strongly in support of what would have been a nine-level upward variance from a 71 to an 80. The seriousness of this offense, which we've discussed, is basically the presence of a weapon that Mr. Mathis should not have had playing the part in intimidating a 15-year-old male to remain in his residence. But he didn't make that alternative finding, though, and we see that sometimes. He I'm sorry? A judge will say, well, even if I'm wrong about the four levels on the gun, I would vary upwards to 80 months anyway because of his horrible criminal history. But he didn't make us, he didn't make that type of finding. He did not. He did not. Chief Judge Gerevy also noted the history of his inappropriate sexual activity, which goes all the way back to the 80s. So in 1986 and 1988, while he's on parole status for a financial crime, he is violated on two occasions, both based on four sets of, I believe, parents, but four individuals coming forward with him making inappropriate comments towards their young males and then actually having a sex act with an inappropriate male. So certainly that history, in combination with the 1990 events, supported an upward variance as well. His criminal history, as Chief Judge Gerevy noted, and as apparent from the contested criminal history in the pre-sentence report, is one of the worst criminal histories the court has seen. The length of the convictions for burglaries, even the criminal mischiefs, involves some collateral act of violence by Mr. Mathis. He had 10 convictions that also received zero criminal history points. So I think the district court did not abuse its direction, abuse its discretion, excuse me, in varying upward to 80 months. Thank you. Was the harboring charge dismissed? Is that what happened to it? It was dismissed, but I would note the timing of that. He was arrested on federal charges on June 18th, 2013. The harboring was dismissed June 21st, and the state fell in possession of the firearm, I believe, June 23rd. So I think it was in conjunction with the federal charges. Thank you. Thank you, Mr. Westphal. Mr. Ouellette, we'll give you a minute for a rebuttal. Just a couple of case sites out of the appellant's brief that I just want to remind the court of, and I know you've read all the briefs, but in regards to this idea of the weapons enhancement, a clear nexus must be established between the possession of a firearm and the other felony offense, U.S. v. Smith. The district court must find by a preponderance the evidence that another felony was committed and that the firearm facilitated the other felony, U.S. v. Littrell. And then Swanson, and this is all at page 15 of the appellant's brief, and that the connection cannot be just spatial or coincidental of the Swanson case, 610 Fed 3rd at 1008. And then U.S. v. Harper on page 16, the term in connection with must mean the firearm had a purpose or effect with respect to the other felony and not just being the result of mere accident or coincidence, the Harper decision. I was going to go on and just respond to Mr. Westfall, but I see I'm done, Your Honor, so I guess I should hush. Thank you for the opportunity. Thank you, Mr. Willett. And the court notes that you've represented your client here today under the Criminal Justice Act, and we appreciate your willingness to accept an